# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 16-2959

DUDLEY A. KING, APPELLANT,

V.

DAVID J. SHULKIN, M.D.,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued November 16, 2017                    Decided December 21, 2017)

*Zachary M. Stolz* and *Dana N. Weiner*, with whom *Linden K. Nash* was on the brief, all of Providence, Rhode Island, for the appellant.

*Ashley D. Varga* and *Christopher W. Wallace*, with whom *Meghan Flanz*, Interim General Counsel; *Mary Ann Flynn*, Chief Counsel; *Kenneth A. Walsh*, Deputy Chief Counsel; and *Omar Yousaf*, Appellate Counsel, were on the brief, all of Washington, D.C., for the appellee.

Before SCHOELEN, GREENBERG, and ALLEN, *Judges*.

ALLEN, *Judge*: This appeal requires us to revisit an area of the law to which the Court has been a frequent visitor: extraschedular ratings. This issue is both critically important to veterans and notoriously difficult for advocates and decision-makers. It justifies a precedential opinion to clarify significant aspects of the process for and substance of extraschedular referral.

The appellant, Dudley A. King, appeals through counsel a June 1, 2016, Board of Veterans' Appeals (Board) decision denying an initial compensable disability rating for bilateral hearing loss.[1] The matter was referred to a panel of the Court, with oral argument, to determine principally (1) as a general matter under 38 C.F.R. § 3.321(b)(1) and this Court's decision in *Thun v. Peake*, 22 Vet.App. 111 (2008), *aff'd sub nom. Thun v. Shinseki*, 572 F.3d 1366 (Fed. Cir. 2009), what role, if any, does the possibility of a higher *schedular* rating play in an *extraschedular* analysis; and (2) if there is anything particular about bilateral hearing loss that alters this analysis. We hold that the availability of a higher schedular rating is irrelevant in an extraschedular analysis. We

---

[1] The appellant does not appeal the Board's decision denying him a higher schedular rating for his bilateral hearing loss. Because the appellant has not challenged this portion of the Board decision, the appeal as to that issue will be dismissed. *See Pederson v. McDonald*, 27 Vet.App. 276, 281-86 (2015) (en banc) (declining to review the merits of an issue not argued on appeal and dismissing that portion of the appeal).

further hold that this interpretation of the law is a general principle under § 3.321(b) and does not depend on the particular type of claim at issue. Accordingly, we will set aside the Board's June 1, 2016, decision and remand this matter for further proceedings.

## I. RELEVANT FACTS AND PROCEDURAL HISTORY

The appellant served honorably in the United States Army from 1969 to 1971, including service in the Republic of Vietnam. In 2009, a VA regional office (RO) granted service connection for hearing loss at a noncompensable rating, a decision with which he timely disagreed.

In 2009, the appellant underwent a VA audiological examination. The examiner found "[s]ignificant effects" on the appellant's occupation and noted "[p]oor social interactions" and "[h]earing difficulty." Afterwards, the RO issued a Statement of the Case continuing his noncompensable rating for hearing loss, however, and he perfected his appeal to the Board in 2010.

The appellant underwent another VA audiological examination in 2011 during which the examiner noted balance problems and dizziness associated with a separate condition of residuals of perforated eardrums. The examiner also stated that the effect of his hearing loss on his daily life and occupation was "difficulty hearing." Then, in 2012, the appellant testified at a Board hearing regarding numerous issues resulting from his bilateral hearing loss, including his inability to hear the telephone ring, his need to turn the volume of his television up which drove his wife to leave the room, his need to face a speaker, his inability to hear bird sounds, and his anger at having to ask others to repeat words to him.

In 2014, the Board remanded the matter for yet another medical examination, noting the appellant's possibly worsening symptoms. This subsequent examination found that his hearing loss did not impact his ordinary conditions of daily life or ability to work.

Finally, in 2016, the Board issued the decision on appeal, denying entitlement to a compensable schedular rating for his bilateral hearing loss and extraschedular referral because it found "the rating criteria reasonably describe [the appellant's] disability levels and symptomatology, and provide[] for higher ratings for more severe symptoms." The Board also denied extraschedular referral on a collective basis. This appeal followed.

## II. PARTIES' ARGUMENTS

The appellant argues the Board erred by (1) finding that all of the functional effects of his bilateral hearing loss were contemplated by the rating criteria, such that extraschedular referral was not warranted; (2) failing to consider his entire disability picture when deciding not to refer his claim for extraschedular consideration; and (3) failing to provide adequate reasons or bases for its decision not to consider the combined effects of his other service-connected disabilities in declining to refer his claim for extraschedular consideration. Appellant's Brief (Br.) at 1-19.

The Secretary argues in response that (1) all of the functional effects of the appellant's bilateral hearing loss are contemplated by the rating schedule; (2) the Board was not required to consider the appellant's entire disability picture because the other functional effects the appellant argues should be considered with his bilateral hearing loss are already attributed to non-service-connected disabilities; and (3) the appellant was not entitled to extraschedular referral based on the combined effects of his service-connected disabilities because there is no evidence that his bilateral hearing loss interacts with his post-traumatic stress disorder to create functional effects not already contemplated by the rating criteria. Secretary's Br. at 1-26.

## III. ANALYSIS

We begin by framing the lens through which we review the Board's actions. The Board's determination of whether referral for extraschedular consideration is appropriate is a finding of fact that the Court reviews under the "clearly erroneous" standard of review. *Thun*, 22 Vet.App. at 115. "'A factual finding 'is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Hersey v. Derwinski*, 2 Vet.App. 91, 94 (1992) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Despite this deferential standard of review of the factual determinations encompassed in an extraschedular analysis, the Court reviews legal questions implicated in the Board's decision de novo. *See Butts v. Brown*, 5 Vet.App. 532, 538 (1993) (en banc).

The Board's decision here raises two central issues: (1) whether, in fact, the rating criteria adequately contemplated the functional effects of the appellant's bilateral hearing loss such that extraschedular referral was not required and (2) whether the availability of higher *schedular* ratings

3

has any role in an *extraschedular* analysis by the Board. We consider each issue in turn, but first provide the relevant legal context.

## A. Schedular and Extraschedular Analyses

### 1. The Statutory and Regulatory Framework

Veterans with disabilities resulting from injuries sustained in or diseases contracted during service are entitled to receive service-connected benefits. 38 U.S.C. § 1110. After VA has found a disability to be service connected, it applies rating criteria established in diagnostic codes (DCs) to assign a disability rating. 38 C.F.R. § 3.321(a) (2017). These rating criteria are intended to "represent as far as can practically be determined, the average impairment in earning capacity in civil occupations resulting from disability." *Id.* In other words, the DCs are used as means to translate a given service-connected disability into dollars and cents based on an assessment of the *average* effect on a veteran's ability to earn a living.

Ordinarily, evaluating a disability using either a corresponding or analogous DC is sufficient to adequately compensate a veteran for his or her service-connected disability. *See* 38 C.F.R. §§ 4.20 (2017), 4.27 (2017). Recall, however, that the rating schedule is based on average impairment. Accordingly, for exceptional cases, VA has provided for the assignment of extraschedular ratings in 38 C.F.R. § 3.321(b)(1), which reads, in relevant part:

> To accord justice . . . to the exceptional case where the schedular evaluations are found to be inadequate, the Under Secretary for Benefits or the Director, Compensation and Pension . . . is authorized to approve on the basis of the criteria set forth in this paragraph an extra-schedular evaluation commensurate with the average capacity impairment due exclusively to the service-connected disability or disabilities. The governing norm in these exceptional cases is: A finding that the case present such an exceptional or unusual disability picture with such related factors as marked interference with employment or frequent periods of hospitalization as to render impractical the application of the regular schedular standards.

There is an important point here that bears emphasis, one that can often be lost in the technicalities of the law. The goal of the entire rating process is to appropriately compensate veterans. The schedular and extraschedular analyses are just different means of doing so. One can think of them as something like Robert Frost's diverging roads in his famous poem *The Road Not Taken*.[2] The more traveled road (traditional schedular analysis) may not always adequately

---

[2] Robert Frost, *The Road Not Taken*, available at www.poetryfoundation.org/poems/44272/the-road-not-taken (last visited Nov. 16, 2017).

encapsulate a veteran's disability picture. Therefore, veterans may, provided there is sufficient evidence of record, take the one less traveled by (extraschedular analysis). Regardless of which road is chosen, and unlike Frost's poetic description, the destination is the same: providing veterans with compensation appropriate to make up for the earning-related impact of a service-connected disability.

The relatively few sentences in § 3.321(b)(1) establishing extraschedular consideration have proven to be deceptively difficult to implement. Today's decision is yet another in a line of cases this Court has decided attempting to give context to the extraschedular analysis. We turn now to consider the most significant of the Court's cases to complete our setting of the legal stage.

*2. The* Thun *Framework*

In *Thun v. Peake*, this Court held that the determination of whether a veteran is entitled to referral for consideration of an extraschedular rating under § 3.321(b) is a three-part inquiry. 22 Vet.App. at 115. The first element[3] requires the Board to determine whether the "evidence before VA presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate." *Id.* This first element requires the Board to do nothing more than compare a veteran's specific symptoms and their severity with those contemplated by the plain language of the rating schedule. To be sure, this assessment might be difficult in certain applications. Nevertheless, the components to be considered in the first step are clear: symptoms and their severity on the one hand and the plain language of the schedular criteria on the other. Any impact—or the absence of such impact—on a veteran's employment is irrelevant at this step in the analysis.[4] Such an impact on employment is not a symptom. Rather, it is in the second step that one addresses the underlying effects and their severity that may create an impact on employment.

Returning to the required analysis, if the Board determines that a veteran's symptoms or their severity are not contemplated by the rating schedule as part of its consideration of the first element, the second element requires the Board to "determine whether the claimant's exceptional disability picture exhibits other related factors," such as marked interference with employment or

---

[3] After *Thun*, we made clear that the "steps" in the analysis are, in fact, elements. *See Anderson v. Shinseki*, 22 Vet.App 423, 427 (2009). Thus, a veteran must show that all the elements have been established to trigger a referral for consideration of an extraschedular rating. *Id.*

[4] Of course, if a particular DC itself contains a reference to employment-related matters, the situation would likely be different. The Court need not address that situation in the context of this appeal, however.

frequent periods of hospitalization. *Id.* at 116. In this second element, the effects of the symptoms and severity of a veteran's disabilities would be insufficient to warrant extraschedular referral without evidence showing "other related factors" such as marked interference with employment. *See, e.g.*, *Hunt v. Derwinski*, 1 Vet.App. 292, 296 (1991) (stating that the overall purpose of the statutory and regulatory scheme governing VA compensation law is reflected in the ratings schedule, which rates different mental and physical maladies based upon diminished earning capacity to pay "compensation to veterans when they have, in honorable service to their nation, suffered a loss that is reflected in the decreased ability to earn a living for themselves and their families").

At this point, one moves to the final element. In reality, this last step adds little to the analysis beyond a conclusion because the Board has no choice in what it must do. When the first two elements have been found to exist, the final element mandates that the Board refer the claim to the Under Secretary for Benefits or the Director of the Compensation Service for a determination about whether an extraschedular rating is warranted. *Thun*, 22 Vet.App. at 116.

### B. Application to this Appeal

Now that we have established the relevant legal framework, we turn to the application of that framework to Mr. King's appeal. Regarding extraschedular referral for bilateral hearing loss, the Board found, in relevant part:

> Here, the rating criteria reasonably describe [the appellant's] disability levels and symptomatology, and provide[] for higher ratings for more severe symptoms. As the disability pictures are contemplated by the Rating Schedule, the assigned schedular ratings are, therefore, adequate. Consequently, referral for extra-schedular consideration is not required under 38 C.F.R. § 3.321(b)(1).

The Board, thus, declined to refer the appellant for consideration for an extraschedular rating because it determined that his case did not satisfy the first *Thun* element.

As noted above, it was the Board's reference to "higher ratings for more severe symptoms" that principally drew our attention to this appeal in terms of the need for a precedential opinion. Before addressing that question, however, we must take a brief detour to address a rather remarkable argument the Secretary advances in support of affirmance.

### *1.* Doucette*: Dicta or Holding?*

Our detour concerns the Court's recent decision in *Doucette v. Shulkin*, 28 Vet.App. 366 (2017). In *Doucette*, this Court held that "the rating criteria for hearing loss contemplate the

6

functional effects[5] of decreased hearing and difficulty understanding speech in an everyday work environment." *Id.* at 369 (footnote added). Later in the opinion, the Court wrote that:

> To be clear, although the Court holds that the rating criteria for hearing loss contemplate the functional effects of difficulty hearing and understanding speech, the Court does *not* suggest that the rating criteria contemplate *all* functional impairment due to a claimant's hearing loss. On the contrary, a hearing loss claimant could provide evidence of numerous symptoms, including—for purposes of example only—ear pain, dizziness, recurrent loss of balance, or social isolation due to difficulties communicating, and the Board would be required to explain whether the rating criteria contemplate those functional effects.

*Id.* at 371 (emphasis in original).

Relying in part on this portion of *Doucette*, the appellant argues the rating criteria for bilateral hearing loss do not contemplate the functional effects of his disability, namely social isolation stemming from his inability to hear the telephone ring, his need to turn the volume of his television up which drove his wife to leave the room, his need to face a speaker, his inability to hear bird sounds, and his anger at having to ask others to repeat words to him. In this same vein, the appellant also points out that he suffers from balance problems and dizziness. Unsurprisingly, the Secretary rejects this argument. While his rejection of the appellant's argument is not surprising, the same cannot be said of his reasoning. He argues that the section of *Doucette* quoted above is "dicta because it was not necessary to the disposition of the case." Secretary's Br. at 19.

The Secretary's contention about *Doucette* is clearly wrong. To the extent that the Secretary challenges that portion of *Doucette* stating that there is a class of functional effects that are outside the rating schedule as "dicta," we affirmatively hold now that it was not. The notion that there is a class of functional effects existing outside the rating schedule was integral to the Court's holding there. *Doucette* further provided a non-exhaustive list of functional effects that *could* make up that class of functional effects. But the Court did not, and did not need to, catalogue every conceivable effect that may or may not be included within that class. Nor did the Court in *Doucette* need to explain how the Board should make those determinations. That decision simply acknowledged the *existence* of effects that would be inherently outside the rating schedule but, as none of those effects were present in that case, it did not address them further. Similarly, here, the Court need not address the functional effects that would or would not be contemplated by the rating schedule

---

[5] We note that this Court's decision in *Doucette* referred to "symptoms," "functional effects," and "functional impairments" interchangeably without discussing possible distinctions among these terms. Here, we also use these terms interchangeably and do not address the propriety of doing so.

because, as explained below, the Court will remand the Board's decision in this matter on other grounds.[6] *See Best v. Principi*, 15 Vet.App. 18, 20 (2001).

### 2. *Availability of Higher Schedular Ratings in an Extraschedular Analysis*

Having cleared away the Secretary's argument concerning *Doucette*, we now turn to the question of what role, if any, the availability of higher schedular ratings should play in an extraschedular analysis. As discussed below, and in accord with the Secretary's concession at oral argument, we hold that the availability of higher schedular ratings plays no role in an extraschedular analysis and that it is inappropriate for the Board to deny extraschedular referral on this basis.

The appellant argues the Board misinterpreted the law by using the availability of higher schedular ratings as a basis for denying extraschedular referral. Appellant's Br. at 14-15. The Secretary's position has been less consistent. He initially argued that (1) the "[a]ppellant distorts the Board's extraschedular analysis" by focusing on the part of the Board's statement regarding the availability of higher ratings and not the part finding that the rating criteria reasonably contemplate the functional effects of the appellant's disability and (2) the statement at issue "is a recognition that that[sic] [the] [a]ppellant's symptoms are already contemplated by the schedular rating criteria." Secretary's Br. at 22-23. In the Secretary's supplemental brief, however, he seemed to change his position by arguing that "[i]t would be improper for the [Board] to base its extraschedular analysis on the availability of higher schedular ratings because this would not account for symptoms or severity of symptoms outside the rating schedule." Secretary's Response to the Court's September 7, 2017, Order (Secretary's Supp. Br.) at 4. And at oral argument, the Secretary took an unequivocal position that the availability of higher schedular ratings is irrelevant to the extraschedular analysis. However, the Secretary has consistently taken the position that the Board's statement regarding the availability of a higher schedular rating was "superfluous" in this matter and "does not invalidate the Board's extraschedular analysis . . . ." *Id.* at 4-5.

The Board's apparent use of the fact that the rating criteria "provided for higher ratings for more severe symptoms" as a reason to deny the appellant referral for extraschedular consideration is incorrect as a matter of law. As discussed above, schedular and extraschedular ratings exist as

---

[6] We also need not and do not address the question of whether determining what qualifies as a functional effect not contemplated by an applicable rating criteria is a question of law or a question of fact. It is clear, however, that the determination of the adequacy of *evidence* demonstrating the presence or absence of functional effects is a question of fact.

two separate and distinct paths to disability compensation. The plain language of § 3.321(b)(1) makes this clear: extraschedular consideration should be considered "where the *schedular* evaluations are found to be inadequate." 38 C.F.R. § 3.321(b)(1) (emphasis added).

It cannot possibly be the case, as the Secretary once suggested and that the Board appears to believe, that the availability of higher *schedular* ratings "underscore[s] the fact that [a veteran's] symptoms could still be compensated by the rating schedule" in an *extraschedular* analysis. Secretary's Br. at 23. This logic would functionally invalidate § 3.321(b)(1) entirely. Consider the following example: assume that a veteran has a disability that awards compensation at a 30% rating for veterans with symptoms "a" and "b." Assume also that this disability is awarded a 50% rating for veterans with symptoms "a," "b," "x," and "z." Now presume a veteran is before the Board who is rated at 30% and has sufficient medical evidence exhibiting symptoms "a," "b," and "x" but *not* "z." Under the Board's logic, no matter how significantly that veteran's earning ability were impaired, the Board would be permitted to grant the veteran only a 30% rating and deny referral for extraschedular consideration because, as it found here, the rating criteria "provided for higher ratings for more severe symptoms." Such a finding, however, would leave the veteran entirely uncompensated for symptom "x" with no recourse to extraschedular consideration because symptom "x" is contemplated by a higher schedular rating. This example is precisely the situation § 3.321(b)(1) was created to address. The fact that the Board's logic (supported at least in the Secretary's original brief) causes the regulation to be ineffective to accomplish its principal goal is powerful evidence of why that logic is wrong.

Furthermore, as the appellant notes, "[u]sing the possibility of a higher schedular rating to deny extraschedular consideration also reads out the 'severity' portion" of the first *Thun* element. Appellant's Supp. Br. at 4. The first element of *Thun*, as discussed above, requires the Board to compare both the symptomatology and *severity* of a disability when determining if schedular ratings adequately contemplate a veteran's symptoms. *Thun*, 22 Vet.App. at 115. Therefore, relying on the availability of higher schedular ratings in denying extraschedular consideration is directly contrary to this Court's ruling in *Thun* and warrants remand. *See Tucker v. West*, 11 Vet.App. 369, 374 (1998) (holding that remand is warranted "where the Board has incorrectly applied the law, failed to provide an adequate statement of reasons or bases for its determinations, or where the record is otherwise inadequate").

9

At oral argument and in his briefs, the Secretary argued that any error in the Board's decision was harmless because the Board's reference to the availability of higher schedular ratings was "superfluous." Secretary's Suppl. Br. at 4-5. We can find no basis for finding it so. The Board's rather cursory discussion of extraschedular referral unmistakably cites the higher schedular ratings when declining to refer the matter. There is no way to disentangle this reasoning from the Board's decision such that we could find any error harmless. Common sense would dictate that the Board, as busy as it is, would not include a reason for declining to take an action when, in reality, that reason was not a reason at all. At a minimum, the Court is uncertain about the bases for the Board's decision, something that alone would require remand. *See Gilbert v. Derwinski*, 1 Vet.App. 49, 57 (1990) (holding that remand is warranted when an agency's inadequate statement of reasons or bases for its decision frustrates judicial review).

The only other way to find the Board's error harmless would be if we concluded that the evidence did not establish the presence of the various functional effects not contemplated by the rating schedule or that, if such effects were present, there was insufficient evidence of their linkage to a service-connected disability. Such determinations would require us to engage in a host of fact finding, something this Court is unwilling to do on this record.

There is one last question to consider: is there anything special about hearing loss that suggests that the principles discussed in this opinion are limited to that type of claim? We hold that there is not. Section 3.321 is applicable to all claims. Without a basis to do so in the text of the regulation, it would be inappropriate for the Court to hold that this regulation applies to one type of claim alone or, conversely, that one type of claim is excluded from the general meaning. *See Lockheed Corp. v. Widnall*, 113 F.3d 1225, 1227 (Fed. Cir. 1997) ("To interpret a regulation we must look at its plain language and consider the terms in accordance with their common meaning."). Accordingly, our interpretation of § 3.321(b) set forth above applies regardless of the type of disability at issue.

Given the disposition of the appeal described above, the Court need not address the remaining arguments and issues raised by the appellant at this time. *See Best*, 15 Vet.App. at 20. On remand, the appellant is free to submit additional evidence and argument, including the arguments raised in his briefs to this Court, in accordance with *Kutscherousky v. West*, 12 Vet.App. 369, 372-73 (1999) (per curiam order), and the Board must consider any such evidence or argument submitted, *Kay v. Principi*, 16 Vet.App. 529, 534 (2002). The Court reminds the Board

that "[a] remand is meant to entail a critical examination of the justification for the decision," *Fletcher v. Derwinski*, 1 Vet.App. 394, 397 (1991), and the Board must proceed expeditiously, in accordance with 38 U.S.C. §§ 5109B and 7112.

## IV. CONCLUSION

After consideration of the parties' briefs and oral arguments, the record on appeal, and the governing law, the Board's June 1, 2016, decision is SET ASIDE and REMANDED for further proceedings consistent with this decision.